LOTTINGER, Judge.
This is an action for personal injuries and property damage arising out of an automobile accident which occurred on the Maestri Bridge in the Parish of St. Tammany on July 28, 1956. The petitioner sets forth that about 6:20 p. m. on that evening he was driving his 1956 Buick automobile in a northerly direction across the bridge, and that as he was in the process of overtaking the Mercury automobile owned by defendant Thomas H. Hood and driven by his minor son, Thomas Lee Hood, the latter suddenly and without warning swerved to the left forcing petitioner’s car to the left and against the guard rail of the bridge.
An answer was filed in the way of a general denial and, further, alleging negligence on the part of plaintiff in driving at an excessive rate and in attempting to pass the Hood car when it was in the process of overtaking and passing another vehicle. Alternatively, the answer pleads by way of defense the doctrine of last clear chance and contributory negligence.
The trial court rejected the demands of the plaintiff and he has appealed.
Thomas Lee Hood testified that about 6:20 p. m. on July 28, 1956, he was driving a green 1951 Mercury accompanied by his father, mother, brother and sister with his father seated on the right hand side of the front seat next to him. When he was over half, way across the Maestri Bridge which traverses Lake Pontchartrain and proceeding at 40 mph there was a car in front of him which he was trying to pass and another car in the rear over 100 yards behind him. As he prepared to pass the car in front of him he looked in the rear view mirror and did not see anyone coming behind him, and as there were no approaching vehicles, he pulled out into his left lane to pass the car. After he had pulled over from his lane at a point when his right front fender was even with the left rear fender of the car which he wished to pass, he was struck by a following car (plaintiff’s) which he had not seen. He stated that when he was struck he applied his brakes and missed the car in front of him and turned to his right. The car that he had sighted about a hundred yards behind him he did not see again, and he stated further that he did not see the car that struck him although he did see something out of the corner of his eye but he did not know what. He gave as his reason for not seeing the oncoming car that it was approaching too fast. It was daylight at the time of the accident.
After the accident he alighted from his car and walked to the other man’s car which was close to a half mile away from the point of impact. He described the plaintiff’s car as being a Buick but stated that he did not see the plaintiff there. He described the damages to the car that he was driving as being to the left rear fender but did not notice any damages to the Buick. He stayed with his car until officers came to investigate the accident about 8 o’clock. No one was injured in the car in which he was driving. On cross examination the witness stated that he was 15 years old at the time of the accident.
The witness estimated the speed of the car in front of him which he intended to pass as being about 35 mph. He stated that when it was about a car length ahead of him he first noticed the car behind him which at that time was 100 or more yards to his rear. He estimated the speed of the following vehicle between 35 and 40 mph. He stated that the accident occurred after he had pulled into the left lane, straightened out and when his right front fender was even with the rear fender of the forward vehicle. The damage to his vehicle occurred to the left rear fender around the fender skirt and above it. He applied his brakes right after being struck by the following vehicle and turned to the right into his own lane. It was about 7 o’clock when he got out of his car and went to see the other car or about a half hour after the accident occurred. The other car was on the right hand side of the bridge in a straight position in the road. He did not *73 see Mr. Hernandez but saw the ambulance pass by from Slidell in the direction of New Orleans. His car was drivable after the accident, and after the police had made the investigation they continued on their way. He denied having ever told a State Trooper that he had failed to look in his rear view mirror before pulling over into the left lane. He explained that he was still in his right hand lane when he looked to the rear through his mirror, and that, between that time and the occurrence of the accident, he did not again look into his rear view mirror. He stated that when he looked into the mirror, he could see into the left hand traffic lane and that he did not see the Hernandez car. When asked if he had seen the car that passed him hit the railing of the bridge, the witness replied that he had not.
The plaintiff, John C. Hernandez, testified that the accident happened on the Maestri Bridge in St. Tammany Parish between S :30 and 6 o’clock at which time he was proceeding from New Orleans at a speed of approximately 40 mph in the direction of St. Tammany Parish. He stated that when he entered the bridge there was an automobile in front of him which was a 19S1 Mercury, being the same vehicle with which he was involved in the accident. • He stated that he followed this car for about half way across the bridge and did not attempt to pass him because the traffic was too heavy. He stated when he had a chance to pass he blew his hom and got into the other lane, and when he was just in front of the other car’s left rear fender and in the left lane of traffic, he was forced to pull to the left to avoid the accident which resulted in his arm getting caught between the car and the bridge. As a result^ he stated that he blacked out and could not state how far from the point of the accident his car came to rest. He was taken from the scene to Slidell where an ambulance was called which took him to the Veterans’ Hospital in New Orleans.
Getting back to the accident, Hernandez stated that it occurred as he was in the left lane proceeding to pass Hood when all of a sudden the latter “whipped” out of his lane and he “whipped” back but “was short”, and that the left side of the Hood car struck the right side of his car. Specifically, he stated that the left rear of the Hood car struck the right front fender of his car. He reiterated that when the accident occurred he was already in the left lane and had blown his horn two or three times.
On cross examination he stated that he had worked for the Bohn Motor Company commencing around the first of June, 1956. He stated that he was driving with one hand on the steering wheel with his left arm on the window. He stated that the bridge was wide enough for three cars and that when the accident occurred, the Hood car was over the center line at a 45° angle. He did not remember whether he collided with any other cars after having collided with the Hood car nor did he remember whether he had hit the rail again after the collision. He did not remember the name of the man that picked him up nor did he remember having spoken to him. He stated that he blew his horn when he was in the left lane three or four lengths behind the car that he was attempting to pass. There was another car ahead of the vehicle which he was passing. He stated that it was daylight and repeated that he blew his horn two or three times.
On re-direct examination he stated that he did not have time to apply his brakes. He stated that the Hood car was following very closely to the car in the front of it.
John B. Williams, State Trooper who had investigated the accident, testified that he arrived at the- scene at approximately one-half hour to 45 minutes after the accident occurred. Mr. Hernandez was not at the scene of the accident when he arrived, he having already been taken to Slidell. He talked with Mr. Hood and his son and stated that it was his recollection that the son did not see the Hernandez vehicle when it pulled out. The officer went to see Mr. Hernandez some two hours later but did not talk with him too much as he was being ad *74 ministered Morphine. He found blood and a piece of skin on the bridge rail and the Hernandez vehicle at rest approximately 500 feet away. The Hood car he found to be about half that distance from the point of impact.
On cross examination the witness stated that the speed limit was either 40 or 45 mph but that he was not sure which. He said further that he remembered seeing skid marks but did not remember where they were.
Mrs. Thomas Hood testified that she was riding in the car driven by her son, Thomas, at the time of the collision with Mr. Hernandez being seated in the rear on the left hand side, and that their car was hit on the back fender. She stated that they had pulled out of their lane and started to get even with the car they were passing when the other car came by and hit them in the rear and then kept going down the bridge passing other cars with no effort being made to pull back. She stated that it was daylight at the time and that she estimated the speed of the Hernandez vehicle at 80 mph and that her son came to a stop in the right lane of traffic.
Mr. Thomas Hood testified that he was seated on the right front seat of the car just before the accident
This witness gave the following version of the accident: “This traffic was coming by and then there was a vacant stretch and he pulled out to pass the car in front of us. I seen the boy was going to pass, and from natural instinct, I have been driving a good while, I glanced over my shoulder and as far as I could see, everything was clear. There was a car behind me, I could see the car, but just as the boy pulled out, the car behind us whipped out and proceeded to pass. My son had never pulled over completely in the left lane, and my boy pulled the car back over about half way over the white line, that’s when he was attempting to pass a car in front of him and then this car struck my car about even with the back end of the car. My front bumper was even with his rear bumper.” He stated that the Hernandez vehicle continued and that he did not know then what had happened to it. He said that the fender skirt on his car had been knocked off from the bumper and that there was a little crease in the door. He described the impact to his car as not being great at all. Mr. Hood stated that he did not hear a horn blow.
 From the above and foregoing we experience no difficulty in finding that young Hood was negligent in turning into the left lane without first ascertaining that it was safe to do so. See LSA-R.S. 32:-236. While, of course, he stated that he looked in his rear view mirror and saw no cars, other than the one some 100 yards to his rear, there is no excuse for his not having seen the plaintiff’s car. It was certainly visible and under the law he is charged with having seen that which he could and should have seen. We note, further, the absence of any testimony by him or other passengers in the car to the effect that he gave any indication whatever of his intention to pass.
Negligence is charged against plaintiff by defendants in driving at an excessive rate, they relying to a great extent on Mrs. Hood’s testimony that he was going 80 miles per hour. None of the other occupants of the car so testified and the record does not satisfy us that he was proceeding at a rate approaching that.
The plaintiff is further charged with negligence in driving with his left arm on the window and only one hand on the steering wheel. While it is undoubtedly better driving practice to have both hands on the wheel, defendants have not pointed out nor can we see where his action in this respect could have contributed to the accident. Young Hood contends that he was entirely in the left lane when it occurred, but the physical damage shows this not to be cor *75 rect as the damage was to the left rear and right front of the cars. We are convinced that he pulled into the left lane after plaintiff was also there attempting to pass- and, therefore, the position of plaintiff’s left hand and arm is of no consequence.
The issue of quantum has not been discussed in brief by either party. It was stipulated that the damages to plaintiff’s automobile totaled $233.86, and he testified that the wrecker and ambulance charges were $20 and $25 respectively. The plaintiff testified that he was employed at the time of the accident by the Bohn Motor Company of New Orleans as a body and fender man at a salary of approximately $100 a week and that he was unable to return to work until the last week of August, 1957. This being the case, he was incapacitated a total of at least 54 weeks and should receive $5,400 therefor. This, added to the above mentioned damages totaling $278.-86 together with his hospital bill of $1,936, entitles him to a total for special damages of $7,614.86.
The record discloses that plaintiff’s left arm was extremely mutilated and that he suffered an open fracture of both bones of the forearm with severe soft tissue damage. He was hospitalized for approximately thirteen months (with the exception of several leaves) and underwent various operations for skin-graft, bone graft and the insertion and removal of wires and pins. In spite of having gotten what one of the doctors termed “remarkably good results” from his injury, the plaintiff’s arm was still disabled to some extent as of the date of trial.
We are of the opinion that plaintiff is entitled to $7,500 for the pain and suffering and for the disability to his arm.
For the reasons assigned the judgment appealed from is reversed, and it is now ordered that there be judgment in favor of plaintiff and against defendants in the sum of $15,114.86, together with legal interest thereon from date of judicial demand until paid, with costs of court.
Judgment reversed and rendered.